**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **TONYA GAMBINO,** on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | |
| **BERRY, DUNN, MCNEIL & PARKER, LLC,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Tonya Gambino ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Berry, Dunn, McNeil & Parker, LLC ("Berry Dunn" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

### I.     INTRODUCTION

1.     Plaintiff brings this class action against Berry Dunn for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI"), including names, addresses, Social Security numbers, dates of birth, and individual health insurance policy numbers (the "Private Information"), from criminal hackers.

2.     Berry Dunn, based in Portland, Maine, is a national consulting and accounting firm that serves a variety of businesses and governmental entities.

1

3.     On or about April 25, 2024, Berry Dunn filed official notice of a hacking incident with the Office of Maine Attorney General.[1] Under state and federal law, organizations must report breaches involving PHI within at least sixty (60) days.

4.     On or around the same time, Berry Dunn also sent out data breach notice letters (the "Notice") to individuals whose information was compromised as a result of the hacking incident.

5.     Based on the Notice sent to Plaintiff and "Class Members" (defined below), unusual activity was detected on one of its vendor's networks on September 14, 2023. In response, Defendant launched an investigation. Berry Dunn's investigation revealed that an unauthorized party had access to certain files that contained sensitive information related to Berry Dunn's Health Analytics Practice Group which manages its clients and their patients' data, and that such access took place on an undisclosed date (the "Data Breach"). Yet, Berry Dunn waited seven months to notify the public that they were at risk.

6.     As a result of this delayed response, Plaintiff and Class Members had no idea for seven months that their Private Information had been compromised, and that were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

7.     The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. The data included, but is not limited to Social Security numbers, dates of birth, and individual health insurance policy numbers that Berry Dunn collected and maintained.

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/f51173b0-8935-424e-871a-08e64c147b2e.shtml (last visited Apr. 29, 2024).

8.      Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns and insurance claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.      There has been no assurance offered by Berry Dunn that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.     Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.     Plaintiff brings this class action lawsuit to address Berry Dunn's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

12.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Berry Dunn, and thus Berry Dunn was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.     Upon information and belief, Berry Dunn failed to properly monitor its vendor and the computer network and systems that housed the Private Information. Had Berry Dunn properly monitored its vendor and implemented its own proper data security and monitoring protocols, it could have prevented the Data Breach or at least discovered it and alerted Plaintiffs and Class Members thereof sooner.

14.     Plaintiff's and Class Members' identities are now at risk because of Berry Dunn's negligent conduct as the Private Information that Berry Dunn collected, maintained, and transferred is now in the hands of data thieves and other unauthorized third parties.

15.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, breach of contract, breach of implied contract, unjust enrichment, breach of fiduciary duty, breach of confidence, breach of third-party beneficiary contract, and declaratory judgment.

## II.     <u>PARTIES</u>

17.     Plaintiff Tonya Gambino is and at all times mentioned herein was an individual citizen of the State of Pennsylvania.

18.     Defendant Berry Dunn is a consulting and accounting firm with its principal place of business at 2211 Congress Street, Portland, Maine, 04102.

### III.     JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Berry Dunn. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.     This Court has jurisdiction over Berry Dunn because Berry Dunn operates in and/or is incorporated in this District.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Berry Dunn has harmed Class Members residing in this District.

### IV.     FACTUAL ALLEGATIONS

**A. *Berry Dunn's Business and Collection of Plaintiff's and Class Members' Private Information***

22.     Berry Dunn is a leading national professional services firm providing assurance, tax, and consulting services to businesses, nonprofits, and government agencies throughout the US and its territories.[2] Founded in 1974, Berry Dunn provides these services across a broad array of industries and business sectors, including hospitals and healthcare organizations.  Through its business clients, Berry Dunn serves over a million individuals throughout the United States. Berry Dunn employs more than 200 people and generates approximately $43.5 million in annual revenue.

23.     As a condition of receiving services, Berry Dunn requires that its clients' patients entrust it with highly sensitive personal and health information. In the ordinary course of receiving

---

[2] *See* https://www.berrydunn.com/about (last visited Apr. 29, 2024).

service from Berry Dunn, Plaintiff and Class Members were required to provide their Private Information to Defendant.

24.     In its Privacy Policy, Berry Dunn promises its clients and their patients that "we endeavor to protect such information against unauthorized disclosures by using secure technologies. Berry Dunn uses reasonable safeguards designed to protect your information through our databases, policies, and procedures. We also take reasonable steps to ensure that our service providers also protect our information."[3]

25.     Thus, due to the highly sensitive and personal nature of the information Berry Dunn acquires and stores with respect to its clients' patients, Berry Dunn, upon information and belief, promises to, among other things: keep individuals' Private Information private; comply with industry standards related to data security and the maintenance of its clients' patients' Private Information; inform its clients' patients of its legal duties relating to data security and comply with all federal and state laws protecting their Private Information; only use and release individuals' Private Information for reasons that relate to the services it provides; and provide adequate notice to patients if their Private Information is disclosed without authorization.

26.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Berry Dunn assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

27.     Plaintiff and Class Members relied on Berry Dunn to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

---

[3] *See* https://www.berrydunn.com/privacypolicy.aspx (last visited Apr. 24, 2024).

**B.  *The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members***

28.     According to Defendant's Notice, it learned of unauthorized access to its vendor's computer systems on September 14, 2023, with such unauthorized access having taken place on an undisclosed date.

29.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including Social Security numbers and health insurance policy numbers.

30.     On or about April 25, 2024, roughly seven months after Berry Dunn learned that the Class's Private Information was first accessed by cybercriminals, Berry Dunn finally began to notify its clients' patients that its investigation determined that their Private Information was affected.

31.     Berry Dunn had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

32.     Plaintiff and Class Members provided their Private Information to Berry Dunn with the reasonable expectation and mutual understanding that Berry Dunn would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

33.     Berry Dunn's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

34.     Berry Dunn knew or should have known that its electronic records would be targeted by cybercriminals.

**C.  *The Healthcare Sector is Particularly Susceptible to Data Breaches***

35.     Berry Dunn was on notice that companies in the healthcare industry are susceptible targets for data breaches.

36.     Berry Dunn was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[4]

37.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[5]

---

[4] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on Apr. 29, 2024).

[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on Apr. 29, 2024).

38.     The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[6] In 2022, the largest growth in compromises occurred in the healthcare sector.[7]

39.     Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[8]

40.     Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[9]

41.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other

---

[6] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on Apr. 29, 2024).

[7] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on Apr. 29, 2024).

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on Apr. 29, 2024).

[9] *Id*.

organization, including credit bureaus, have so much monetizable information stored in their data centers."[10]

42.     As a large vendor to healthcare organizations, Berry Dunn knew, or should have known, the importance of safeguarding patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Berry Dunn's clients' patients as a result of a breach. Berry Dunn failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D.  Berry Dunn Failed to Comply with FTC Guidelines

43.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

44.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct

---

[10] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Apr. 29, 2024).

any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

45.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

46.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47.     As evidenced by the Data Breach, Berry Dunn failed to properly implement basic data security practices. Berry Dunn's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

48.     Berry Dunn was at all times fully aware of its obligation to protect the Private Information of its clients' patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### E. *Berry Dunn Failed to Comply with Industry Standards*

49.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

50.     Some industry best practices that should be implemented by businesses dealing with sensitive PHI like Berry Dunn include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

51.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

52.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### F. *Berry Dunn Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information*

54.     In addition to its obligations under federal and state laws, Berry Dunn owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Berry Dunn owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

55.     Berry Dunn breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Berry Dunn's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.   Failing to adequately protect its clients' patients' Private Information;

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to sufficiently train its employees regarding the proper handling of its clients' patients Private Information;

    e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA; and

     f.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

56.    Berry Dunn negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

57.    Had Berry Dunn remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

58.    Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Berry Dunn.

### G. Berry Dunn Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

59.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[11] Exposure of  highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them

---

[11] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Apr. 29, 2024).

of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

60.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

61.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

62.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

63.     Thus, even if certain information were not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access

accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

64.    One such example of this is the development of "Fullz" packages.

65.    Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

66.    The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

67.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a

freeze on their credit, and correcting their credit reports.[12] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

68.    Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

69.    In fact, a study by the Identity Theft Resource Center[13] shows the multitude of harms caused by fraudulent use of PII:



---

[12] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Apr. 29, 2024).

[13] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on Apr. 29, 2024).

70.     PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[14]

71.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

72.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[15]

73.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

74.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial

---

[14] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on Apr. 29, 2024).

[15] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on Apr. 29, 2024).

repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[16]

75.    The ramifications of Berry Dunn's failure to keep its clients' patients' Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

76.    Here, not only was sensitive medical insurance information compromised, but Social Security numbers were also compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

77.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[17]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[16] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on Apr. 29, 2024).

[17] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Apr. 29, 2024).

78.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

79.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

### H.  Plaintiff's and Class Members' Damages

*Plaintiff Tonya Gambino's Experience*

80.     Plaintiff Gambino is one of Defendant's clients' patients and, as such, was required to provide substantial amounts of her Private Information to Defendant.

81.     On or about April 25, 2024, Plaintiff Gambino received a letter entitled "Notice of Data Security Incident" which told her that her Private Information had been compromised through the Data Breach. The notice letter informed her that the Private Information stolen included her "name, address, Social Security number, date of birth, and individual health insurance policy number."

82.     The notice letter surprisingly failed to offer Plaintiff Gambino any complimentary credit monitoring services, despite the lifetime of increased risk of identity theft, including but not limited to, potential medical fraud, that she now faces as a result of Defendant's lax data security practices.

83.     Plaintiff Gambino suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

84.     Plaintiff Gambino would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its clients' patients' personal and health information from theft, and that those systems were subject to a data breach.

85.     Plaintiff Gambino suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

86.     Plaintiff Gambino suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Gambino entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

87.     Plaintiff Gambino suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

88.     Plaintiff Gambino has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

89.     As a result of the Data Breach, Plaintiff Gambino made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Gambino has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

90.     As a result of the Data Breach, Plaintiff Gambino has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or

using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Gambino is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

91.     Plaintiff Gambino also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Gambino; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

92.     As a result of the Data Breach, Plaintiff Gambino anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

93.     In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

94.     Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

95.     Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

96.     As a direct and proximate result of Berry Dunn's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns and insurance claims filed in their names, utility bills

opened in their names, credit card accounts opened in their names, and other forms of identity theft.

97.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

98.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

99.    Plaintiff and Class Members also lost the benefit of the bargain they made with Berry Dunn. Plaintiff and Class Members entrusted their inherently valuable Private Information to Defendant, which was intended to be accompanied by adequate data security but were not. Thus, Plaintiff and the Class did not receive the benefit of the bargain.

100.    Additionally, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[18] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[19]

---

[18] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on Apr. 29, 2024).

[19] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on Apr. 29, 2024).

101.   As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

102.   Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

103.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Berry Dunn, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its clients' patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

104.   As a direct and proximate result of Berry Dunn's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.     CLASS ACTION ALLEGATIONS

105.   Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

106.    Specifically, Plaintiff proposes the following Nationwide Class (referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

107.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

108.    Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class, as well as add subclasses before the Court determines whether certification is appropriate.

109.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

110.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of 1,107,354 impacted individuals of Berry Dunn whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Berry Dunn's records, Class Members' records, publication notice, self-identification, and other means.

111.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Berry Dunn engaged in the conduct alleged herein;

b.   Whether Berry Dunn's conduct violated the FTCA;

c.   When Berry Dunn learned of the Data Breach

d.   Whether Berry Dunn's response to the Data Breach was adequate;

e.   Whether Berry Dunn unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f.   Whether Berry Dunn failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.   Whether Berry Dunn's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   Whether Berry Dunn's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether Berry Dunn owed a duty to Class Members to safeguard their Private Information;

j.   Whether Berry Dunn breached its duty to Class Members to safeguard their Private Information;

k.   Whether hackers obtained Class Members' Private Information via the Data Breach;

l.   Whether Berry Dunn had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.   Whether Berry Dunn breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

    n.   Whether Berry Dunn knew or should have known that its data security systems and monitoring processes were deficient;

    o.   What damages Plaintiff and Class Members suffered as a result of Berry Dunn's misconduct;

    p.   Whether Berry Dunn's conduct was negligent;

    q.   Whether Berry Dunn's conduct was *per se* negligent;

    r.   Whether Berry Dunn was unjustly enriched;

    s.   Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

    t.   Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

112.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Berry Dunn. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

113.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

114.   <u>Predominance</u>. Berry Dunn has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Berry Dunn's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

115.   <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Berry Dunn. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

116.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Berry Dunn has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

117.   Finally, all members of the proposed Class are readily ascertainable. Berry Dunn has access to the names and addresses and/or email addresses of Class Members affected by the

Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Berry Dunn.

**CLAIMS FOR RELIEF**

**COUNT I**
**NEGLIGENCE**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

118.    Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

119.    Berry Dunn knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

120.    Berry Dunn's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

121.    Berry Dunn knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Berry Dunn was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

122.    Berry Dunn owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Berry Dunn's duties included, but were not limited to, the following:

   a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect its clients' patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

123. Berry Dunn's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

124. Berry Dunn's duty also arose because Defendant was bound by industry standards to protect its clients' patients' confidential Private Information.

125. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Berry Dunn owed them a duty of care to not subject them to an unreasonable risk of harm.

126. Berry Dunn, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Berry Dunn's possession.

127. Berry Dunn, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

128. Berry Dunn, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

129. Berry Dunn breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.  Failing to adequately monitor the security of its networks and systems;

    c.  Failing to periodically ensure that its email system maintained reasonable data security safeguards;

    d.  Allowing unauthorized access to Class Members' Private Information;

    e.  Failing to comply with the FTCA;

    f.  Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

    g.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

130. Berry Dunn acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that

Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

131.    Berry Dunn had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Berry Dunn with their Private Information was predicated on the understanding that Berry Dunn would take adequate security precautions. Moreover, only Berry Dunn had the ability to protect its systems (and the Private Information that it stored on them) from attack.

132.    Berry Dunn's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

133.    As a result of Berry Dunn's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

134.    Berry Dunn's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

135.    As a result of Berry Dunn's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

136.    Berry Dunn also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

137.     As a direct and proximate result of Berry Dunn's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

138.     The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

139.     Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

140.     In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Berry Dunn to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT II
### NEGLIGENCE *PER SE*
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

141.     Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

142.     Pursuant to Section 5 of the FTCA, Berry Dunn had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

143.     Berry Dunn breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

144.     Specifically, Berry Dunn breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

145.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Berry Dunn's duty in this regard.

146.    Berry Dunn also violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

147.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Berry Dunn's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

148.    Plaintiff and Class Members are within the class of persons that the FTCA is intended to protect and Berry Dunn's failure to comply with both constitutes negligence *per se*.

149.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Berry Dunn's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

150.    As a direct and proximate result of Berry Dunn's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

151.    As a direct and proximate result of Berry Dunn's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

152.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Berry Dunn to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT III
### BREACH OF CONTRACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

153.    Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

154.    Plaintiff and Class Members entered into a valid and enforceable contract through which they paid money to Berry Dunn in exchange for services. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiff's and Class Members' Private Information.

155.    Berry Dunn's Privacy Policy memorialized the rights and obligations of Berry Dunn and its clients and its client's patients. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

156.    In the Privacy Policy, Berry Dunn commits to protecting the privacy and security of private information and promises to never share Plaintiff's and Class Members' Private Information except under certain limited circumstances.

157.    Plaintiff and Class Members fully performed their obligations under their contracts with Berry Dunn.

158.    However, Berry Dunn did not secure, safeguard, and/or keep private Plaintiff's and Class Members' Private Information, and therefore Berry Dunn breached its contracts with Plaintiff and Class Members.

159.    Berry Dunn allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class Members' Private Information without permission. Therefore, Berry Dunn breached the Privacy Policy with Plaintiff and Class Members.

160.    Berry Dunn's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA and applicable industry standards, resulted in Berry Dunn providing services to Plaintiff and Class Members that were of a diminished value.

161.    As a result, Plaintiff and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendant's failure to fully perform its part of the bargain with Plaintiff and Class Members.

162.    As a direct and proximate result of Berry Dunn's conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

163.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Berry Dunn to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT IV
### BREACH OF IMPLIED CONTRACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

164.    Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

165.    This Count is pleaded in the alternative to Count III above.

166.    Berry Dunn provides consulting and accounting services to its clients that provide healthcare services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

167.    Through Defendant's sale of services to Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

168.    As consideration, Plaintiff and Class Members paid money, directly or indirectly, to Berry Dunn and/or turned over valuable Private Information to Berry Dunn. Accordingly, Plaintiff and Class Members bargained with Berry Dunn to securely maintain and store their Private Information.

169.    Berry Dunn accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

170.    In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiff and Class Members intended and understood that Berry Dunn would adequately safeguard the Private Information as part of those services.

171.    Defendant's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and

implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with the FTCA to make sure that Plaintiff's and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

172.    Plaintiff and Class Members would not have entrusted their Private Information to Berry Dunn in the absence of such an implied contract.

173.    Had Berry Dunn disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Berry Dunn.

174.    As a vendor to healthcare organizations, Berry Dunn recognized (or should have recognized) that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

175.    Berry Dunn violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

176.    A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to Berry Dunn in exchange for Berry Dunn's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

177.    Plaintiff and Class Members have been damaged by Berry Dunn's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT V
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

178.   Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

179.   This Count is pleaded in the alternative to Counts III and IV above.

180.   Plaintiff and Class Members conferred a benefit on Berry Dunn by turning over their Private Information to Defendant and by paying for products and services, directly or indirectly, that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

181.   Upon information and belief, Berry Dunn funds its data security measures entirely from its general revenue, including from payments made to it, directly or indirectly, by Plaintiff and Class Members.

182.   As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Berry Dunn.

183.   Berry Dunn has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

184.   Berry Dunn knew that Plaintiff and Class Members conferred a benefit upon it, which Berry Dunn accepted. Berry Dunn profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

185.    If Plaintiff and Class Members had known that Berry Dunn had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

186.    Due to Berry Dunn's conduct alleged herein, it would be unjust and inequitable under the circumstances for Berry Dunn to be permitted to retain the benefit of its wrongful conduct.

187.    As a direct and proximate result of Berry Dunn's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Berry Dunn's possession and is subject to further unauthorized disclosures so long as Berry Dunn fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

188.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Berry Dunn and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Berry Dunn from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

189.    Plaintiff and Class Members may not have an adequate remedy at law against Berry Dunn, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VI**
**BREACH OF CONFIDENCE**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

190.    Plaintiff restates and realleges the allegations in paragraphs 1-140 as if fully set forth herein.

191.    Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by Berry Dunn and ultimately accessed and acquired in the Data Breach.

192.    As a vendor to healthcare organizations, Berry Dunn has a special, fiduciary relationship with its clients and their patients, including Plaintiff and Class Members. Because of that special relationship, Berry Dunn was provided with and stored Plaintiff's and Class Members' Private Information and had a duty to maintain such Information in confidence.

193.    Patients like Plaintiff and Class Members have a privacy interest in personal medical and other matters, and Berry Dunn had a duty not to disclose such matters concerning its clients' patients.

194.    As a result of the parties' relationship, Berry Dunn had possession and knowledge of highly sensitive and confidential PHI and PII belonging to Plaintiff and Class Members, information that was not generally known.

195.    Plaintiff and Class Members did not consent nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

196.    Berry Dunn breached its duty of confidence owed to Plaintiff and Class Members by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of Plaintiff's and Class Members' Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement adequate information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients' patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff's and Class members' Private Information to a criminal third party.

197.    But for Berry Dunn's wrongful breach of its duty of confidence owed to Plaintiff and Class Members, their Private Information would not have been compromised.

198.    As a direct and proximate result of Berry Dunn's wrongful breach of its duty of confidence, Plaintiff and Class Members have suffered and will continue to suffer the injuries alleged herein.

199.    It would be inequitable for Berry Dunn to retain the benefit of controlling and maintaining Plaintiff's and Class Members' Private Information at the expense of Plaintiff and Class Members.

200.     Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

### COUNT VII
### BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

201.     Plaintiff restates and realleges the allegations in paragraphs 1-140 as if fully set forth herein.

202.     Defendant entered into contracts, written or implied, with its clients to perform services that include, but are not limited to, providing consulting and accounting services. Upon information and belief, these contracts are virtually identical between and among Defendant and its clients around the country whose patients, including Plaintiff and Class Members, were affected by the Data Breach.

203.     In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the PII and PHI of Plaintiff and the Class.

204.     These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its clients. Defendant knew that if it were to breach these contracts with its clients, the clients' patients—Plaintiff and Class Members—would be harmed.

205.     Defendant breached the contracts it entered into with its clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

206.     Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

207.     Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

<u>**COUNT VIII**</u>
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

208.     Plaintiff restates and realleges the allegations in paragraphs 1-140 as if fully set forth herein.

209.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

210.     Berry Dunn owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

211.     Berry Dunn still possesses Private Information regarding Plaintiff and Class Members.

212.     Plaintiff alleges that Berry Dunn's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

213.     Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

44

a. Berry Dunn owes a legal duty to secure its clients' patients' Private Information and to timely notify individuals of a data breach under the common law and the FTCA;

b. Berry Dunn's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect its clients' patients' Private Information; and

c. Berry Dunn continues to breach this legal duty by failing to employ reasonable measures to secure individuals' Private Information.

214.     This Court should also issue corresponding prospective injunctive relief requiring Berry Dunn to employ adequate security protocols consistent with legal and industry standards to protect individuals' Private Information, including the following:

a. Order Berry Dunn to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Berry Dunn must implement and maintain reasonable security measures, including, but not limited to:

  i.     engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Berry Dunn's systems on a periodic basis, and ordering Berry Dunn to promptly correct any problems or issues detected by such third-party security auditors;

ii.     engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.     segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Berry Dunn's systems;

v.      conducting regular database scanning and security checks;

vi.     routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating its clients and their patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

215.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Berry Dunn. The risk of another such breach is real, immediate, and substantial. If another breach at Berry Dunn occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

216.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Berry Dunn if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Berry Dunn's compliance with an injunction requiring reasonable prospective data security

measures is relatively minimal, and Berry Dunn has a pre-existing legal obligation to employ such measures.

217.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Berry Dunn, thus preventing future injury to Plaintiff and other patients whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a.   An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

b.   Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.   An order instructing Berry Dunn to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.   An order requiring Berry Dunn to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: April 29, 2024.                    Respectfully submitted,

By:  */s/ David E. Bauer*
David E. Bauer, Bar No 3609
443 Saint John Street
Portland, Maine 04102
Tel: (207) 804-6296
E  david.edward.bauer@gmail.com:

Mason A. Barney (*pro hac vice* to be filed)
Tyler J. Bean (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com

*ATTORNEYS FOR PLAINTIFF  TONYA GAMBINO, on behalf of herself and all others similarly situated*